No. 14-1726

# United States Court of Appeals for the Fourth Circuit

EDWARD L. GILMORE,

*Plaintiff-Appellant,*

*v.*

ERIC H. HOLDER, JR., IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE UNITED STATES,

*Defendant-Appellee.*

Appeal from the United States District Court for the Eastern District of Virginia
in Case No. 13-cv-789, Judge Leonie M. Brinkema

**BRIEF FOR PLAINTIFF-APPELLANT EDWARD L. GILMORE**

CATHERINE M.A. CARROLL
ERIC MAHR
AMANDA L. MAJOR
DANIEL AGUILAR
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

September 23, 2014

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __14-1726__          Caption: __Gilmore v. Holder__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Edward L. Gilmore__
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Catherine M.A. Carroll                    Date:    Sept. 23, 2014

Counsel for: appellant Edward L. Gilmore

## CERTIFICATE OF SERVICE
**************************

I certify that on ___Sept. 23, 2014___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Catherine M.A. Carroll                              Sept. 23, 2014
_____(signature)_____                                    _____(date)_____

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

JURISDICTIONAL STATEMENT ...................................................... 4

ISSUES PRESENTED FOR REVIEW ................................................ 4

STATEMENT OF THE CASE ............................................................ 5

    A.    The *Segar* Litigation And The DEA's Stipulated
        Procedures ..................................................................... 5

    B.    Factual Background ......................................................... 8

        1.    Gilmore's law-enforcement experience .................... 8

            a.    Chicago Police Department ............................. 8

            b.    DEA special agent ......................................... 9

            c.    DEA Aviation Division ................................. 11

            d.    Deputy Chief Inspector ................................. 13

        2.    Gilmore's SES application ..................................... 17

        3.    DEA's promotion decision ..................................... 19

    C.    Proceedings Below ......................................................... 21

        1.    Pretrial proceedings ............................................... 21

        2.    Evidence at trial .................................................... 24

        3.    Exclusion of evidence about the Stipulated
            Procedures ............................................................ 31

        4.    Judgment ............................................................... 33

SUMMARY OF THE ARGUMENT ................................................... 35

ARGUMENT ...................................................................37

I.    THE TRIAL RECORD DID NOT PERMIT JUDGMENT AS A MATTER
      OF LAW .................................................................37

      A.    Standard Of Review ...........................................37

      B.    The Title VII Burden-Shifting Framework .........................37

      C.    Considering The Record As A Whole, Reasonable Minds
            Could Differ About Whether The DEA's Offered
            Justifications Were Pretextual ................................39

            1.    Backlog of background checks ...............................40

            2.    Lack of field experience..................................43

II.   THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING
      TESTIMONY REGARDING THE ORIGIN AND PURPOSES OF DEA'S
      STIPULATED PROCEDURES ...............................................48

      A.    Standard Of Review ...........................................48

      B.    Evidence About The Stipulated Procedures Was Relevant
            To Understanding The Irregularity Of Roach's
            Promotion From The "Qualified" List And To Evaluating
            Pretext.......................................................49

      C.    Evidence Placing The Stipulated Procedures In Their
            Appropriate Context Is Admissible Under This Court's
            Precedent ....................................................52

      D.    Exclusion Constituted Reversible Error.........................56

CONCLUSION ..................................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Bank of Montreal v. Signet Bank*, 193 F.3d 818 (4th Cir. 1999) ...............................56

*Benjamin v. United Merchants & Manufacturers, Inc.*,
  873 F.2d 41 (2d Cir. 1989) ........................................................................41

*Bennett v. Saint-Gobain Corp.*, 507 F.3d 23 (1st Cir. 2007) ...............................43, 47

*Blow v. City of San Antonio*, 236 F.3d 293 (5th Cir. 297) ...........................................50

*Buckley v. Mukasey*, 538 F.3d 306 (4th Cir. 2008) ........ 1, 37, 39, 43, 48, 53, 54, 55, 56

*Byrnie v. Town of Cromwell*, 243 F.3d 93 (2d Cir. 2001) .........................................45

*Diaz v. Eagle Produce Ltd.*, 521 F.3d 1201 (9th Cir. 2008) .......................................50

*EEOC v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) ...................................42

*First Union Commercial Corp. v. GATX Capital Corp.*,
  411 F.3d 551 (4th Cir. 2005) ...........................................................................37

*Fischbach v. D.C. Department of Corrections*, 86 F.3d 1180
  (D.C. Cir. 1996) ..................................................................................................45

*Fontenot v. Taser International, Inc.*, 736 F.3d 318 (4th Cir. 2013) .........................37

*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210 (10th Cir. 2002) ...........................44

*Ham v. Washington Suburban Sanitary Commission*,
  158 F. App'x 457 (4th Cir. 2005) ...................................................................47

*Holesey v. Armour & Co.*, 743 F.2d 199 (4th Cir. 1984) .........................................44

*Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439 (4th Cir. 2001) ...........................56

*Johnson v. Hugo's Skateway*, 974 F.2d 1408 (4th Cir. 1992) ...........................53, 54

*McCullough v. Real Foods, Inc.*, 140 F.3d 1123 (8th Cir. 1998) .............................47

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ...............................25, 38

*Pandazides v. Virginia Board of Education*, 13 F.3d 823
  (4th Cir. 1994) ................................................................40

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) ..............38, 39, 47

*Roebuck v. Drexel University*, 852 F.2d 715 (3d Cir. 1988) ..................................39

*Segar v. Ashcroft*, 422 F. Supp. 2d 117 (D.D.C. 2006) ........................................5, 7

*Segar v. Civiletti*, 508 F. Supp. 690 (D.D.C. 1981) ..............................................5, 50

*Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007).................... 1, 5, 6, 7, 8, 49, 50, 56

*Segar v. Smith*, 738 F.2d 1249 (D.C. Cir. 1984) ........................................................6

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)........................................38

*Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188
  (7th Cir. 1992) ...............................................................40

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248
  (1981)............................................................................45

*Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808 (10th Cir. 2000) ...................39

*United States v. Cabrera-Beltran*, 660 F.3d 742 (4th Cir. 2011) ............................52

*United States v. Russell*, 971 F.2d 1098 (4th Cir. 1992) ........................................48

*Vaughan v. MetraHealth Cos.*, 145 F.3d 197 (4th Cir. 1998) ................................50

*Warren v. Halstead Industries Inc.*, 802 F.2d 746 (4th Cir. 1986)........................51

*Young v. Warner-Jenkinson Co.*, 152 F.3d 1018 (8th Cir. 1998)............................51

## STATUTES AND RULES

28 U.S.C.
  § 1291 ...............................................................................4
  § 1331 ...............................................................................4

42 U.S.C. §§ 2000e *et seq.*.........................................................5

Fed. R. App. P. 25(a)(5)..............................................................10

4th Cir. Local R. 25(c)(3)(C) .......................................................10

iv

## PRELIMINARY STATEMENT

Plaintiff-Appellant Edward Gilmore is a veteran of law enforcement who served for 10 years in the Chicago Police Department and 20 years in the United States Drug Enforcement Administration ("DEA"). Starting as a patrol officer, Gilmore rose quickly through the ranks to become a tactical agent, an undercover investigator, a terrorism task-force member, a DEA Special Agent, Assistant Special Agent in Charge of the DEA's Aviation Division, and eventually the Deputy Chief Inspector ("DCI") of DEA's Office of Security Programs, responsible for overseeing physical, personnel, and information security for all DEA facilities worldwide. Throughout his career, Gilmore's supervisors consistently evaluated his performance as "Excellent" and "Outstanding."

When Gilmore applied to become a member of the DEA's Senior Executive Service ("SES")—the highest level in the civil service—his application was evaluated according to procedures the DEA had adopted in response to long-running class-action litigation over racial discrimination at the DEA. *See Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007); *see also Buckley v. Mukasey*, 538 F.3d 306 (4th Cir. 2008). In that litigation, the DEA agreed to remedy prior discriminatory practices by using certain "Stipulated Procedures" designed to introduce greater transparency and objectivity into SES promotions. After reviewing Gilmore's application under those Procedures, a panel of DEA agents ranked Gilmore a "Best

Qualified" candidate for the SES.  No other applicant at the time received a higher score.

In 2007, the DCI position Gilmore had occupied for two years was elevated to the SES level.  Despite Gilmore's Best Qualified ranking and the "Outstanding" and "Excellent" evaluations Gilmore had received during his tenure as DCI, then-DEA Administrator Karen Tandy informed Gilmore in October 2007 that he would not be promoted with the position.  At that time, Tandy gave no explanation for her decision.  Gilmore, who is African-American, later learned that Tandy had passed him over in favor of a white candidate who had achieved only a "Qualified" ranking.

After exhausting administrative remedies, Gilmore filed suit in the Eastern District of Virginia, alleging disparate treatment on the basis of race in violation of Title VII of the 1964 Civil Rights Act.  Gilmore's case went to trial, and the jury heard both parties' evidence over two days of testimony.  But after the defense rested, the district court entered judgment as a matter of law for the DEA, concluding that no rational juror could find the DEA's proffered reasons for the decision to be pretextual.

That decision requires a new trial.  It is undisputed that Gilmore established a prima facie case of racial discrimination, and at trial, he presented substantial evidence that the justifications former Administrator Tandy offered in this

litigation for denying Gilmore the promotion were in fact pretextual. Although Tandy asserted that she felt Gilmore had insufficient enforcement experience and no idea what it was like "to be on the ground" making "life and death decisions," Gilmore's decades of work as an agent in the field, building cases and infiltrating criminal organizations, directly contradicted that notion. And while Tandy claimed that Gilmore had failed to clear out a backlog of background checks while serving as DCI, she admitted that she knew of no facts that could support her asserted concern. Based on that evidence and other evidence of pretext, a reasonable juror could have found in Gilmore's favor.

The district court also abused its discretion by precluding Gilmore from introducing evidence about the origin and purpose of the Stipulated Procedures the DEA had adopted to govern SES promotions, including the Best Qualified list. Although Tandy chose not to follow those Procedures when she decided not to promote Gilmore, the district court excluded any evidence that would have explained the purpose of the Best Qualified list or the significance of Tandy's departure from the Stipulated Procedures. DEA witnesses, including Tandy, aggravated the situation by downplaying the importance and meaning of the Best Qualified list. This error, too, requires a new trial.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Gilmore's Title VII claim under 28 U.S.C. § 1331.  On June 17, 2014, the district court granted judgment as a matter of law to the defendant.  JA523-524, 527.  On July 17, 2014, Gilmore filed a timely notice of appeal.  JA528.  This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.      In this case, the plaintiff, an African-American DEA agent, was impartially and objectively evaluated to be a better qualified candidate for promotion than the white agent who received the promotion.  Did the district court err when it granted the defendant judgment as a matter of law, concluding that no reasonable juror could find that a preponderance of the evidence supported the plaintiff?

2.      In this case, the plaintiff, an African-American DEA agent, alleged that he suffered racial discrimination when he was denied a promotion in favor of a white agent who was evaluated to be less qualified than him under the DEA's court-approved Stipulated Procedures for promotion to the Senior Executive Service.  Did the district court err when it excluded evidence concerning the origin, purpose, and application of the Stipulated Procedures, which were specifically

4

designed to prevent racial discrimination in the evaluation and promotion of DEA

agents to the DEA's Senior Executive Service?

## STATEMENT OF THE CASE

### A.    The *Segar* Litigation And The DEA's Stipulated Procedures

The DEA evaluates and promotes agents to the SES under procedures it

adopted in litigation to remedy discriminatory practices.  In 1977, Henry Segar and

other African-American DEA agents brought a class-action lawsuit against the

DEA in the U.S. District Court for the District of Columbia, alleging employment

discrimination on the basis of race in violation of Title VII of the 1964 Civil Rights

Act, 42 U.S.C. §§ 2000e *et seq.  See Segar v. Civiletti*, 508 F. Supp. 690, 692

(D.D.C. 1981).  After a bench trial, the district court held, based on expert

evidence and witness testimony, that the DEA had "discriminated against African-

American special agents with respect to salary, grade at entry, work assignments,

supervisory evaluations, discipline, and promotions."  *Segar v. Mukasey*, 508 F.3d

16, 18 (D.C. Cir. 2007) (discussing *Segar v. Civiletti*, 508 F. Supp. at 712-715).

Among other things, as the district court explained, the promotion process the

DEA had employed for senior positions before the lawsuit was "unwritten and

opaque" and "a mystery to the Special Agents."  *Segar v. Ashcroft*, 422 F. Supp. 2d

117, 129 (D.D.C. 2006).  "The method … was entirely subjective—there were no

standardized criteria, no rating and ranking, and no required qualifications."  *Id.*

The U.S. Court of Appeals for the District of Columbia affirmed the liability determination and ordered the district court to "consider … remedial options to ensure that black agents attain their rightful places at the upper levels of the DEA." *Segar v. Smith*, 738 F.2d 1249, 1295 (D.C. Cir. 1984).

As relevant here, in 2002, the DEA agreed on remand to a stipulation that would control its promotion of employees to SES positions. *Segar v. Mukasey*, 508 F.3d at 19. Those "Stipulated Procedures" provided that once an employee applied for the SES, his or her supervisor would complete an evaluation and a panel of impartial DEA agents would score the employee's qualifications and develop a list of Best Qualified candidates. *Id.* The Stipulated Procedures required the DEA Administrator to fill open SES positions by selecting from the Best Qualified list or transferring a current SES member. *Id.* at 20.

The Stipulated Procedures were "developed and constructed to provide DEA with a valid, non-discriminatory mechanism for selecting DEA special agent executives and to provide agency selection officials with the highest quality candidates from which to choose." *Segar v. Mukasey*, 508 F.3d at 19 (internal quotation marks omitted); *see also* JA304-308, JA316-322 (DEA human resource specialist Pamela Horvath describing the application and evaluation process). In contrast to the process the DEA had previously followed, the Stipulated Procedures were designed to "provide transparency" and "foster confidence that [SES]

6

promotions are made on the basis of merit rather than race." *Segar v. Mukasey*, 508 F.3d at 24 (internal quotation marks omitted).

From March 2002 to August 2003, DEA agents were promoted from the Best Qualified list in accordance with the Stipulated Procedures. *Segar v. Mukasey*, 508 F.3d at 20. In August 2003, however, newly confirmed DEA Administrator Karen Tandy departed from those procedures to promote an agent who was not on the Best Qualified list, had not been evaluated, and had not submitted an SES application. *Id.* In response, the *Segar* plaintiffs sought an injunction to cancel that promotion and compel Administrator Tandy to follow the Stipulated Procedures. *See Segar v. Ashcroft*, 422 F. Supp. 2d at 125-126. But in 2006, the district court held that the Stipulated Procedures were ambiguous as to whether the Administrator had authority to select a candidate who had not applied pursuant to the Stipulate Procedures or been ranked as Best Qualified. *Id.* at 151-154. Finding no meeting of the minds, the district court held the Stipulated Procedures void and unenforceable. *Id.* at 154-155, 157.

That order was vacated in November 2007, when the D.C. Circuit held that the "Stipulated Procedures plainly compel the DEA to follow those procedures in making promotions." *Segar v. Mukasey*, 508 F.3d at 21. Thus, the Stipulated Procedures went back into effect, providing that "the Administrator of the DEA

may not promote to an SES position a non-SES agent who is not on the list of best-qualified candidates generated by the stipulated procedures." *Id.* at 18.

## B.     Factual Background

This appeal concerns an SES promotion the DEA made in October 2007, when the Stipulated Procedures were temporarily suspended.  Plaintiff Edward Gilmore, an African-American, applied for the position and received a Best Qualified ranking.  Without explanation, however, Administrator Tandy passed Gilmore over in favor of a white agent who was not ranked Best Qualified.

### 1.     Gilmore's law-enforcement experience

Edward Gilmore has served in law enforcement for over 30 years, starting as an officer in the Chicago Police Department and eventually working his way through DEA ranks to serve as a Deputy Chief Inspector.  JA123-124, 129, 184-185 (Gilmore).

#### a.     Chicago Police Department

Gilmore began his law-enforcement career in 1977 with the Chicago Police Department ("CPD").  After just a year and a half as a patrol officer, Gilmore was promoted to work as a plain-clothes tactical officer, responsible for making felony arrests and performing undercover drug busts.  JA123-124.  In his undercover role, Gilmore faced numerous life-threatening situations involving armed drug dealers.  JA125-128.  At trial, Gilmore recounted one such case when, in responding to a call of shots fired, Gilmore entered an apartment to find himself an inch away from

8

the muzzle of a bolt-action shotgun.  JA128-129.  "[I]t was the loudest click I ever heard in my life when that gun did not fire."  JA129 (Gilmore).

After six years in CPD's tactical unit, Gilmore was detailed to the Intelligence Division, where he was assigned to a newly formed terrorism task force.  JA126-127.  In that role, Gilmore worked as a co-case agent with the FBI on terrorism-related cases, performing surveillance, gathering intelligence to support investigations, and coordinating with the New York field division.  JA127-128.

### b.    DEA special agent

In 1987, after nearly a decade of police work, Gilmore joined the DEA as a special agent.  JA129.  Working primarily in Atlanta, Gilmore excelled as a criminal investigator and was promoted to GS-13 level—the highest level attainable for a special agent—after just three years, the earliest date of eligibility.  JA130-131.  Throughout his tenure as a special agent, Gilmore's superiors consistently ranked his performance as "Excellent" and "Outstanding."  JA138.

As a special agent, Gilmore was responsible for building drug prosecutions from the ground up by using informants, identifying targets in criminal organizations, developing strategies in tandem with the U.S. Attorney's Office, and executing on those strategies, often through undercover work.  JA131.  Gilmore regularly had to make mission-critical decisions under stressful and dangerous

9

conditions.  During one extensive investigation, for example, Gilmore—who was

working undercover—was alone at one point with a drug dealer who demanded

$20,000 more for cocaine than Gilmore had originally negotiated.  JA133-134.

When Gilmore resisted, the dealer retrieved his submachine gun and fired into a

phonebook to show Gilmore how effectively and quietly it operated with a

silencer.  JA134.  Gilmore maintained his cover and agreed to return later with the

extra money.  JA134-135.  In a subsequent raid of the dealer's apartment, Gilmore

appeared in his undercover persona to be "arrested" and gain the dealer's trust.

JA135-136.  Gilmore's plan worked, allowing him to cultivate a relationship with

another arrestee, who was the head of the drug ring.  JA136.  That relationship led

to the organization's final bust, in which Gilmore—whose backup did not arrive—

pursued the suspects alone on foot in a torrential downpour while preventing the

loss of crucial evidence.  JA137, 643-645.[1]  The dealers were convicted, and the

U.S. Attorney's Office gave Gilmore a commendation, crediting the operation's

success in part to Gilmore's "talent as an undercover agent" and "good sense [as]

an excellent experienced agent."  JA644.

---

[1]     As part of a protective order in discovery, several trial exhibits included in
the joint appendix were produced with the marker "Confidential" or "Attorney's
Eyes Only."  DE 51 (Stipulated Protective Order).  The exhibits included in the
appendix (e.g., Plaintiff's Exhibit 35, reproduced at JA643-645) were introduced at
trial in open court, without any sealing order or other protective instructions.  All
appendix materials have been redacted under Federal Rule of Appellate Procedure
25(a)(5) and Local Rule 25(c)(3)(C).

### c.    DEA Aviation Division

When the DEA sent out a call for more pilots, Gilmore responded by taking flying lessons on his own time while he continued to work his regular caseload. JA138 (Gilmore).  After earning his pilot's license, Gilmore joined the DEA's Aviation Division as a special agent pilot.  In that role, he flew in enforcement operations, provided surveillance information to agents on the ground, assisted in undercover operations, and pursued suspects.  JA138-142.  On one occasion, Gilmore pursued a suspect from the air while simultaneously coordinating with air traffic control at Atlanta Hartsfield Airport to clear commercial flights from the airspace, eventually resulting in a successful arrest.  JA139-143.  During his years as a special agent pilot, Gilmore's superiors evaluated his performance as "Excellent."  JA145; *see also* PX11, PX12.[2]

In 1996, Gilmore was promoted to the position of Resident Agent in Charge of the DEA's Northeastern Aviation Resident Office in Teterboro, NJ—a GS-14 position he held for four years.  JA146.  In this capacity, Gilmore was the "only person out in the field making decisions" for DEA pilots from Virginia to Canada, while continuing to serve as a special agent pilot himself.  JA146-147.  During that

---

[2]    Citations to "PX" refer to plaintiff's exhibits admitted at trial but not included in the joint appendix due to their volume.  These exhibits consist of Gilmore's pre-2005 performance evaluations.

tenure, Gilmore continued to receive "Excellent" and "Outstanding" evaluations from his superiors. JA147-152; *see also* PX13, PX14, PX15, PX16, PX18.

In 2000, Gilmore was transferred to the DEA's Office of Professional Responsibility ("OPR"), where he investigated alleged misconduct by DEA employees. JA153. This role allowed Gilmore to "learn the workings of [DEA] headquarters." *Id.* As Gilmore explained at trial, he "already knew about how to make cases out on the street, but [OPR] was [about] how the wheels of management turned within the organization." JA156. Gilmore was rated "Outstanding" on every evaluation he received at OPR. JA154-156; PX19, PX17, PX20, PX22.

In 2002, Gilmore applied for the GS-15 level, seeking to become an Assistant Special Agent in Charge ("ASAC"). JA157, 170. In support of that application, Gilmore's supervisor prepared an evaluation giving Gilmore the highest possible rating on each of several categories of skills and experience and praising Gilmore's judgment, interpersonal and communication skills, professionalism, and work ethic. JA164-166, 565-567. On an assessment test that evaluated GS-15 candidates across a range of skills, Gilmore scored a 94 out of 100. JA167-169, 530. Among other things, the assessment test measured Gilmore's "Ability to Plan and Coordinate Enforcement Operations" through an interactive exercise designed to test Gilmore's decision-making in a live

12

enforcement situation.  JA168-169.  Gilmore received the highest possible rating on that portion of the test.  JA169, 530.

Candidates for ASAC positions were selected by the DEA's Career Board. JA170.  In May 2002, the Career Board selected Gilmore to serve as ASAC for the DEA's Aviation Division in Fort Worth, Texas.  JA170-171.  In this role, Gilmore was responsible for the administration of the entire Aviation Division, managing a $30 million budget, training special agent pilots, and supervising other DEA agents.  JA171.  Throughout his three years as ASAC of the Aviation Division, Gilmore's performance was consistently rated "Outstanding."  JA172-175; PX21, PX23, PX24, PX25.

### d.    Deputy Chief Inspector

While Gilmore was serving as ASAC of the Aviation Division, his supervisor encouraged him to apply for the position of Deputy Chief Inspector for the Office of Security Programs ("OSP") at DEA headquarters.  JA184-185. Gilmore's supervisor had already spoken with the Chief Inspector, Rogelio Guevara, about Gilmore's fitness for the job and told Gilmore that there was a good chance the DCI position would be elevated from GS-15 to the SES—the highest civil-service level within the DEA.  JA184, 206, 304.

Following this advice, Gilmore applied for the DCI position in October 2005 and got the job.  JA185.  Chief Inspector Guevara testified at trial that he had

found Gilmore to be the "best qualified" candidate for the DCI position. JA246

And he testified that he believed Gilmore's "significant enforcement experience"

as a field agent and an ASAC would allow him to perform well in the DCI role.

JA246-247.

As DCI for the Office of Security Programs, Gilmore oversaw "information

technology, personnel security, and physical security" for "all DEA facilities

around the world." JA185 (Gilmore). Although OSP had 230 employees and a

$30 million budget, it was underfunded and understaffed for the significant duties

it had to perform. JA186 (Gilmore); JA284 (defense admission). In particular, a

new presidential directive required OSP to conduct background checks of all

persons having regular access to DEA facilities—including both new and existing

employees—and required those background checks to be completed within a

specified time period. JA186-187 (Gilmore); JA648.

When he became DCI, Gilmore inherited a backlog of 9,000 unfinished

background investigations. JA187 (Gilmore); *see also* JA288 (DEA counsel

conceding that "[t]he backlog on [Gilmore's] arrival surely was not his creation");

JA386 (DEA witness Kasson: "Mr. Gilmore did not create the backlog").

Although Gilmore's office requested additional personnel to process this caseload,

that request went unfulfilled. JA260-261 (Guevara). Instead, OSP lost 12

contractors. JA189 (Gilmore).

While Gilmore oversaw these thousands of background checks, OSP was also responsible for implementing a new computer program called EQuip. JA189 (Gilmore). The EQuip program allowed new government employees to submit their personal information electronically to the hiring agency; the agency would then submit that information to the Office of Personnel Management ("OPM") to conduct a background check, and OPM would send the results back to the hiring agency. *Id.* Significant complications with this new computer system prevented users from submitting or retrieving data. JA189-190.

In light of these considerable challenges, as Chief Inspector Guevara testified, Gilmore worked to "do more with less." JA278. Gilmore consulted frequently with Guevara and Deputy Administrator Michele Leonhart about OSP's progress on the EQuip issues and backlog of background checks. JA191 (Gilmore).[3] To address the background checks, Gilmore coordinated with OPM to shift responsibility for some investigations, eliminate duplicative efforts, and otherwise streamline the background-check process. JA191-192; *see also* JA192-193 (personnel changes). By the end of 2007, Gilmore's office had significantly

---

[3]    Leonhart currently serves as the Administrator of the DEA. To avoid any confusion between her and Karen Tandy, who served as Administrator during the time relevant to this case, this brief refers to Leonhart by the Deputy Administrator title she held in 2007.

reduced the backlog.  JA193 (backlog reduced from 9,000 cases to 2,000); *see also* JA236 (backlog of 7,600 as of June 2007).

Throughout Gilmore's two-year tenure as DCI, Guevara rated his performance "Outstanding" and "Excellent."  JA193-206 (Gilmore); JA568 (2005 performance evaluation); JA584 (2006 performance evaluation); JA601 (2007 interim performance evaluation).  In his 2005 evaluation, Guevara cited Gilmore's "noteworthy" early efforts to "look for means of improv[ing]" OSP's operations and services.  JA195 (Gilmore); JA571.  Guevara described Gilmore as "a natural at coalition building" with "strong liaison ability."  JA197 (Gilmore); JA581.  Guevara's 2006 evaluation was similar, praising Gilmore's "initiative," "diligence," and "responsibility."  JA199-200 (Gilmore); JA586-588.  Deputy Administrator Leonhart reviewed each evaluation and concurred in each "Outstanding" rating.  JA197-198 (Gilmore); JA494-497 (Leonhart).  None of these evaluations cited any problems or areas of concern.

Chief Inspector Guevara retired in August 2007.  Before his departure, he completed an interim evaluation for Gilmore's performance in 2007, rating him as "Significantly exceeds expectations," which was the "new language for 'Excellent.'"  JA203 (Gilmore).  In a letter, Guevara stated that Gilmore had done a "commendable job of protecting DEA resources" that "saved DEA a large sum of money" and "provided a higher level of security" despite "limited staffing."

JA203-204 (Gilmore); JA618.  Guevara again noted Gilmore's "exceptional liaison ability" and accomplishments as a "coalition builder," with particular skill at soliciting "the best advice from all quarters" and "mov[ing] on a course of action." JA204 (Gilmore); JA618.  As Guevara testified at trial, these evaluations were consistent with his "overall opinion" that Gilmore "brought a lot to the Office of Security Programs" and was "hard working and successful as the deputy chief inspector."  JA248 (Guevara); *see also* JA261 (Guevara) ("I would say that Mr. Gilmore did an outstanding job.  I thought that he was dedicated, and that he worked hard, and that he tried to bring out the best in people[.]").[4]

## 2.     Gilmore's SES application

The Senior Executive Service "is the highest level within the federal government … like the chief operating officer, the decision makers, the CEOs, those type of positions."  JA304 (DEA human resources specialist Horvath).  DEA occasionally held "open seasons" to solicit applications from GS-15 employees interested in joining the SES.  JA304-306.

---

[4]     Guevara explained at trial that his "primary reason[]" for rating Gilmore "Excellent" in the interim 2007 evaluation, instead of "Outstanding" as he had rated him in the previous two years, was "because it's only part of the evaluation period," and Guevara felt that the complete evaluation should await "input from the [new] supervisor."  JA259 (Guevara).  Guevara's successor, James Kasson, "concur[red] with the use of [Guevara's] performance rating … as the final rating," explaining that he "ha[d] not been the supervisor of record" long enough to provide his own evaluation.  JA205 (Gilmore); JA600.

Gilmore applied for the SES during an open season in 2003, while he was serving as ASAC of the Aviation Division.  JA536 (SES application); JA564 (SES score report).  Gilmore submitted an application pursuant to the DEA's Stipulated Procedures, which had been adopted the year before as part of the *Segar* litigation. *See supra* pp. 5-6.  To prepare his application, Gilmore studied the SES Application Handbook, which described in detail the qualifications and procedures for promotion to the SES.  JA180 (Gilmore); JA621-642 (SES handbook).

Under the Stipulated Procedures, Gilmore's application was reviewed by a panel of eight DEA agents who evaluated Gilmore's qualifications across four skill sets.  JA318-319 (Horvath); JA564 (SES score report).  The panel awarded Gilmore a total of 16 out of 20 points.  JA564.  Out of 57 agents who applied for promotion at the same time, none scored higher.  JA183 (Gilmore); JA282-283 (defense admission); JA564.  Gilmore's score qualified him for the Best Qualified list, along with 15 other applicants.  JA319 (Horvath); JA564.  Thirty-nine other applicants were designated as Qualified based on their scores, and two applicants were designated as Minimally Qualified.  JA564.

In addition to his panel score and a detailed description of his experience, Gilmore's SES application included an evaluation from William Brown, Gilmore's supervisor at the time and Special Agent in Charge of the Aviation Division.  *See* JA539-563 (SES application).  Brown praised Gilmore's "exceptional skills" and

"strong working relationship[s]." JA539. Brown also noted Gilmore's "clear understanding of DEA enforcement policies and procedures" and his "strong sense of law enforcement," stating that Gilmore "knows what it takes to be a Law Enforcement Officer at both the local and federal levels." *Id.*; *see also* JA545 ("ability to identify a major program shortcoming before it becomes a problem"); JA551 ("an ethical and fair leader"); JA557 ("outstanding leadership that was directly responsible" for a "successful program").

### 3.    DEA's promotion decision

Until October 2007, Gilmore's DCI position at OSP was a GS-15 position. Although they were smaller offices, the DEA's other two DCI positions—the DCI for Office of Professional Responsibility and the DCI for the Office of Inspections, both occupied by white agents—were already SES positions. JA262-264 (Guevara). When Gilmore took his DCI job in 2005, he understood that it was likely to be elevated to the SES level, and, having qualified for the SES in 2003, Gilmore believed he would be considered for the position. JA206-207 (Gilmore).[5]

---

[5]    In May 2006, Gilmore emailed Deputy Administrator Leonhart expressing concern that "DEA management … may have gotten the mis-impression" that he was not interested in an SES position. JA646; *see* JA207-209 (Gilmore). Gilmore wrote to assure Leonhart that he remained very interested in advancing his career and would "welcome an opportunity to discuss [his] career path." JA646. Leonhart replied: "You are still being considered when vacant SES positions are discussed so I have not heard what you are hearing." *Id.* Leonhart stated that she would be out of the office the following week, but suggested that she and Gilmore meet after her return. *Id.* No follow-up meeting occurred, but Gilmore felt

In October 2007, two years into his tenure as DCI, Gilmore received a call from Administrator Tandy.  JA209-210 (Gilmore).  Tandy informed Gilmore that his DCI position was being elevated from GS-15 to the SES.  JA210.  Tandy also informed him, however, that she had "decided to go in a different direction."  *Id.* She gave no other information or explanation, and the call ended.  *Id.*  A few minutes later, a message went out to DEA's offices worldwide announcing that Tandy had selected Barbara Roach, Assistant Special Agent in Charge in the Philadelphia Division, for promotion to the new SES-level DCI position.  *Id.*; *see* JA709 (announcement of SES promotions).

Gilmore was "crushed" by the news.  JA210.  This marked "probably the all-time lowest point of [his] professional life."  *Id.*  Gilmore's supervisor, Chief Inspector Kasson, asked Gilmore to remain in the DCI post until Roach reported in January 2008.  JA213 (Gilmore); JA401-402 (Kasson).  Gilmore applied for other roles within the DEA, but did not receive any of his requested positions.  JA213 (Gilmore).  Instead, Gilmore ended up as an Associate Deputy Chief Inspector for the Office of Professional Responsibility, where he primarily wrote up intake reports.  JA213-214 (Gilmore).  For Gilmore, this was an effective demotion in terms of responsibility, prestige, and career track.  JA214.

---

reassured that he was being considered for all SES vacancies.  JA209 (Gilmore) ("[T]he ball was in her court to get back to me.  I didn't want to be a pest.").

"[D]emoraliz[ed]" by these events, Gilmore left the DEA soon thereafter and obtained his current job as Chief of Police for Calumet City, Illinois, just outside of Chicago. JA214-215.

### C.   Proceedings Below

#### 1.   Pretrial proceedings

When Gilmore first learned of Tandy's decision, he did not feel he had been discriminated against. JA211 (Gilmore). Gilmore had "never filed an EEO complaint in [his] entire life" and did not consider himself "a person who ever thinks about that type of action being taken against [him]." JA213. But Gilmore later learned that Barbara Roach, the agent who had been promoted in his place, was white and had received only a "Qualified" score on her SES application. JA211 (Gilmore); JA283-284 (defense admissions). As DEA witness Kasson testified, Roach had no experience relevant to informational security, physical security, or personnel security, and no subject matter expertise related to the DCI position. JA409 (Kasson); *cf.* JA656 (describing DCI responsibilities for information, physical, and personnel security). Gilmore also thought SES positions were supposed to be filled from the Best Qualified list; yet he had been replaced by someone who was not on that list. JA211 (Gilmore). Considering that information and "some of the previous selections the administrator had made," Gilmore came to the "hard conclusion" that he had been discriminated against. *Id*.

After exhausting administrative remedies, Gilmore commenced this lawsuit. JA22.  The DEA moved to dismiss, but in an initial hearing, the district court denied the motion in substantial part and allowed the case to proceed to discovery, observing that "[t]he facts in this case are real troubling, real troubling." 11/22/2013 Hr'g Tr. 11; *see id.* at 12 ("That's a prima facie case right there."); DE 35 at 1.[6]

After discovery, Gilmore narrowed his claims to the single claim that he had been denied promotion on the basis of race in violation of Title VII, and the DEA moved for summary judgment.  JA61-62, 74-79.  The district court denied the DEA's motion, observing that Gilmore was a "solid plaintiff" with "an excellent track record in law enforcement."  JA74.  On the "uncontested facts," Gilmore had proven his prima facie case; the "big question" that made this case a "close call" was whether the jury would ultimately find discrimination on the basis of race. JA78 ("[W]hether or not the final decision … was tainted or affected by his race is the big question in this case, and it's a very big question.  I really don't know because I haven't seen the witnesses testify.").

Before trial, the DEA moved to exclude testimony about the *Segar* litigation under Federal Rules of Evidence 401 and 403.  DE 152.  Because Administrator Tandy had promoted Roach while the Stipulated Procedures were temporarily

---

[6]     Citations to "DE" refer to docket entries in the district court.

suspended by court order, the DEA argued that testimony about the litigation and

Stipulated Procedures would be prejudicial and irrelevant.  *Id.* at 3-8.  Gilmore

opposed, arguing that he intended to introduce "only certain basic facts about the

*Segar* litigation," including the origin and purposes of the Stipulated Procedures, to

"provide necessary context" for his discrimination claim.  DE 160 at 3; *see id.* at 4

(describing proposed evidence).[7]  And Gilmore suggested that any prejudice could

be cured with an appropriate jury instruction.  *Id.* at 6-7.

At a pre-trial hearing, the court denied the DEA's motion in limine, finding

that "there had been a judicial determination [in *Segar*] and an agreement that the

way in which to avoid a problem with discriminatory promotions was to require

the agency to choose from those who are qualified, from the Highly Qualified

group[.]  I think that that is relevant background information to this case."  JA88.

The court cautioned that it would not allow a prolonged discussion about the entire

37-year history of the *Segar* litigation.  *Id.*  But it concluded that the Stipulated

Procedures—specifically, the requirement that candidates should only be selected

from the Best Qualified list as a prophylactic measure against racial

discrimination—were "certainly … background information" that the jury could

---

[7]     Gilmore explained that he planned to introduce evidence of:  the open
season process for SES positions; the Stipulated Procedures' function as a "valid,
non-discriminatory mechanism" for selecting SES candidates; the use of qualified
lists; and the effect of the *Segar* district court's 2006 ruling on Gilmore's
application for the SES.  DE 160 at 4.

consider, and it concluded that Gilmore's proposed use of the evidence was "pretty reasonable." JA88-89. As Gilmore had suggested, the court stated that it would give a "cautionary instruction" if necessary. JA88.

### 2.    Evidence at trial

The case was tried on June 16 and 17, 2014. Gilmore testified on his own behalf (JA123-239), introduced several defense admissions (JA282-284), and called his former supervisor, Chief Inspector Guevara, who had retired shortly before the October 2007 promotion decision (JA240-281). Guevara testified that he did not recall Administrator Tandy or Deputy Administrator Leonhart ever asking him if he would recommend Gilmore for the position. JA261. Had he been asked, Guevara stated that he would have recommended Gilmore for promotion to the SES. JA261-262.

After Gilmore rested, the DEA moved under Federal Rule of Civil Procedure 50(a) for judgment as a matter of law, arguing that Gilmore "ha[d] not demonstrated by a preponderance of the evidence that there is any pretext in the DEA's decision not to promote him." JA297. The district court denied the motion. JA297-298. The court found "more than enough evidence … for this case to go forward," noting that Gilmore had "made out the prima facie case" and had "already put forward pretext." *Id.*

24

Under the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), the burden thus shifted to the DEA to offer a legitimate, nondiscriminatory reason why Administrator Tandy chose to not promote Gilmore to the SES.  JA457 (Leonhart:  "All the decisions for the SES are made by the administrator.").  Testifying by videotaped deposition, Tandy asserted that she had not considered Gilmore for the DCI position at all.  JA429, 442.  When counsel suggested otherwise, Tandy emphatically repeated:  "[I]t's not that I didn't select him.  I didn't consider him.  I did not consider him."  JA443.[8]

Tandy nonetheless went on to give two reasons why she did not promote Gilmore.  First, Tandy asserted that, as DCI, Gilmore oversaw the DEA's background-check process while there was a backlog processing those investigations.  JA445.  Second, Tandy said that Gilmore lacked the enforcement experience she believed all SES members needed.  JA445-446.  Tandy cited no other reason for passing Gilmore over.  JA414-449; *see also* JA287 (DEA counsel agreeing there are two relevant reasons:  "[t]he law enforcement issue" and "this problem with the backlog").

With respect to the backlog, Tandy testified that she had received a call from the Justice Management Division at the Department of Justice inquiring about the

---

[8]      This was inconsistent with Deputy Administrator Leonhart's testimony that "Gilmore was being considered for vacant SES promotions in 2007," and that Tandy "considered Mr. Gilmore for all the vacant SES positions."  JA510.

DEA's backlog of background investigations.  JA429.  According to Tandy, this call was "extraordinary" and an "embarrassment" that might cause DEA to lose funding.  JA434.  Because Tandy recalled that this conversation occurred "towards the end of [Gilmore's] two years" as DCI, she concluded that the backlog had persisted at alarming levels for two years despite any action by Gilmore.  JA445.

Tandy's familiarity with the backlog, however, was extremely limited.  She admitted she was not aware of the volume of the backlog, what had caused the backlog, whether it predated Gilmore's tenure as DCI, or whether Gilmore had reduced it.  JA444-445.  Tandy's concern appeared to be that the problem persisted for two years and attracted the attention of the Department of Justice.  JA429-430, JA445.  But other DEA witnesses testified that the telephone call from the Justice Management Division was not about the backlog of background checks at all and that it did not come at the end of Gilmore's term.  Deputy Administrator Leonhart testified that this call actually occurred only a year into Gilmore's tenure.  JA479-480; JA730 (September 2006 email from Leonhart to Guevara describing call "today").  And she made clear in a contemporaneous email that the subject of the Justice Department's concern was "DEA's poor progress with EQuip"—the automated computer program—not the backlog of background checks.  JA730.

Moreover, neither of Gilmore's 2006 or 2007 evaluations mentioned any problem with processing the backlog or implementing EQuip.  JA503-504

(Leonhart); JA584-619 (performance evaluations).  And Gilmore testified that when they met to discuss the backlog issue, Leonhart told Gilmore he should not be concerned, saying "Don't worry about that.  That's my problem.  I'll take care of the complaints from Justice.  You just keep doing your job."  JA191.

Administrator Tandy thus shifted to her second reason, testifying that even "assum[ing] that [the backlog issue] was just fine and everything was in good working order," she still "would not have selected Mr. Gilmore … because of his lack of enforcement operations experience."  JA445.  Tandy explained that she considered such experience important for all SES positions because "[i]f you don't know what it's like to be on the ground, bleeding life and death decisions as these people are on the ground in the field performing DEA missions, then it is very difficult to be at a senior executive level."  JA443.  A person could not join the SES, in Tandy's view, "if that person has never supervised an enforcement operation in DEA, and if that person has not held leadership positions in enforcement in the field."  JA443; *see also* JA423-424, 445-446.[9]

Tandy further explained that she felt the Best Qualified list did not adequately reflect this concern.  Tandy "underst[ood] there ha[d] to be a system and there ha[d] to be a review," but said she viewed the Best Qualified list as the

---

[9]    Tandy herself had no enforcement experience; her training was as a lawyer and prosecutor.  JA415-416.

result of a "sterile panel review" that did not "really mean[] that that person is best qualified for every vacancy."  JA441; *see also, e.g.*, JA423 (Tandy:  "[T]here were very qualified people … who were not necessarily on the Best Qualified list"); JA440 (Tandy: "I can't say that I really focus[ed] on what name was on what list"). Accordingly, as part of the process for selecting SES candidates, Tandy asked human resources to compile the list of Best Qualified candidates and the candidates who only ranked as "Qualified" with information about each candidate's ASAC experience.  JA313-314 (Horvath describing preparation of lists); JA690-708 (SES lists including ASAC experience).

Applying this criterion, Tandy concluded that because Gilmore had never handled "mission critical functions" or "life-threatening experiences," he should not be promoted to the SES.  JA446.  Tandy asserted that Gilmore "didn't have experience of conducting and supervising DEA enforcement operations in the field."  JA445-446; *see* JA446 ("He needed to be able to say, I've been there, I know what is involved in the field.").  In Tandy's words, it therefore "would have been fraught with peril to have put Mr. Gilmore in an SES position."  JA446.[10]

---

[10]    The DEA's written qualifications for SES positions, which Gilmore studied thoroughly and relied on in preparing his SES application, did not include Tandy's requirement for field experience.  JA621-642 (SES Application Handbook); *see also* JA180-181 (Gilmore); JA320 (Horvath).  Nor did the handbook state that only DEA agents with specific types of ASAC experience could be considered for SES positions.  JA181-182 (Gilmore).

Asked whether she had any knowledge about Gilmore's enforcement experience, Tandy said only that she knew he had been a police office in "his prior life" and "provided support" in the Aviation Division.  JA447.

Apart from the two reasons Tandy advanced, DEA also elicited evidence at trial intended to cast doubt on Gilmore's qualifications.  Chief Inspector Kasson, who succeeded Guevara as Gilmore's supervisor at OSP, testified that he had not recommended Gilmore for the SES when Leonhart asked for his evaluation. JA378 (Kasson); JA488 (Leonhart).  Contrary to written evaluations describing Gilmore's performance as DCI as "Outstanding" and "Excellent," Kasson—who had been Gilmore's supervisor for only two months and consequently felt he could not complete a formal evaluation (JA600)—"relayed [to Leonhart] that Mr. Gilmore had not done well" (JA488).  Leonhart also testified that she asked Guevara about Gilmore and that Guevara "didn't recommend [Gilmore] for the SES position" at OSP, but did recommend him for consideration in another SES position.  JA473 (Leonhart).  Guevara testified, however, that he recalled no such discussion and that he would have recommended Gilmore if he had been asked. JA261-262 (Guevara).  Administrator Tandy did not cite the absence of a recommendation as a reason not to promote Gilmore.  JA445-446.[11]

---

[11]    When asked why he had not recommended Gilmore for the SES promotion, Kasson stated it was because Gilmore had not "implement[ed] a plan" to reduce the backlog.  JA378.  But Kasson later clarified that Gilmore *did* propose and

The defense also introduced an audio recording of a 2005 meeting of the DEA Career Board, in which senior members of the DEA discussed the promotion and placement of various agents, including Gilmore's 2005 application for the then-GS-15 DCI job.  JA271; *see also* JA475-477 (Leonhart's recollection of the meeting); JA716-727 (meeting transcript); JAVolume III (CD of audio recording).  At the meeting, Leonhart expressed concern that Gilmore had applied for another headquarters job even though he "hasn't had field ASAC time" and that he was therefore "different than the other candidates when it comes to experience" for an SES position.  JA718, 720.  Other members of the board noted, however, that Gilmore had worked for the DEA for many years and had enforcement experience as a police officer.  JA721.  Guevara, also a member of the Board, praised Gilmore as perfectly qualified for the DCI position:  "My number one candidate is Ed Gilmore.  He brings a breadth of experience to the table.  …  He was a police officer for many years, he's been in OPR, and he understands what it is to be service-oriented.  That's what we do in security programs."  JA725.

---

execute a plan to hold people accountable and streamline the adjudication process. JA386-388.  DEA witness Thomas Nuse also testified that he worked with Gilmore on the backlog and generally criticized Gilmore's handling of that job.  JA336-354. Gilmore denied many of Nuse's statements.  JA517-518.  There was no evidence that Tandy or Leonhart ever sought or heard Nuse's views or that Tandy considered those views.

### 3.    Exclusion of evidence about the Stipulated Procedures

Relying on the court's pretrial ruling that evidence about the Stipulated Procedures would be admitted, *supra* pp. 23-24, Gilmore's counsel told the jury in its opening statement that the Stipulated Procedures were "specifically designed not only to identify the best candidate for the job of SES, but to make sure that racial discrimination doesn't infect that process." JA106. But the district court consistently prevented Gilmore from proving that fact or presenting evidence that could contextualize the Stipulated Procedures' origin and purpose. When plaintiff's counsel asked Gilmore for his understanding of how the promotion process was developed, the court sustained the DEA's objection and commented that evidence about the Stipulated Procedures' origin was not "necessary at this point." JA176. When Gilmore testified that the Best Qualified list was "put in place to prevent discrimination," the court ruled that Gilmore would only be able to testify about "his understanding" of the lists. JA177. In response to questioning from the court, Gilmore testified that he thought Best Qualified candidates could be considered for SES positions but Qualified candidates could not. JA177-178. However, Gilmore's limited testimony did not explain why those procedures existed, why they had been suspended, or what purpose they served.

Plaintiff's counsel attempted to elicit this information instead from defense witnesses who could testify about the Stipulated Procedures' purpose and

application.  Specifically, counsel asked the DEA's human resource specialist if the DEA had filled SES positions exclusively from the Best Qualified list in 2008 after the Stipulated Procedures were reinstated.  JA322-323.  The court, however, halted this line of inquiry and sustained the DEA's objection, reasoning that the reinstated Stipulated Procedures were like a post-accident remedy that could not be used to infer liability.  JA323-324.  Although the court permitted plaintiff's counsel to ask about differences between the Best Qualified, Qualified, and Minimally Qualified lists (JA324), the witness denied that there was any substantive difference and testified that the Administrator could promote any applicant:  "They are just lists."  JA326.

Administrator Tandy similarly denied that the lists were meaningful.  Although Tandy testified that the qualified lists were part of an "established court procedure," she did not explain why that procedure existed or that the procedures initially required candidates to be selected only from the Best Qualified list.  JA421-422, 442.  Instead, Tandy testified that the Best Qualified list was not a step above the Qualified list because both were simply evaluations from a "sterile panel review."  JA440-441.

When Deputy Administrator Leonhart took the stand, Gilmore's counsel asked her whether "the SES selection process is designed specifically in response to concerns about racial discrimination."  JA505.  The question elicited an

32

objection and a bench conference.  *Id*.  Gilmore's counsel explained that this line of questioning "goes to the very promotion process that we're talking about and where it came from, as we talked about in the motions in limine.  We just want the jury to understand how that process was arrived at and that it emerged out of the *Segar* race discrimination litigation."  JA505-506.  Put differently, it was critical for the jury to appreciate the "background information" (JA88) surrounding these procedures so that the jury could evaluate for itself whether it was significant that the DEA "set aside promotion criteria that are specifically designed to address racial discrimination" when it passed Gilmore over for promotion (JA506).

The court sustained the DEA's objection, finding that Tandy did not "set aside" the Stipulated Procedures when she promoted Roach because those Procedures had been suspended in 2006.  JA506.  The court further explained that "if the evidence in this case were different," it might have ruled the other way:  "Right now, there's absolutely no evidence that race played a factor in this case.  I just don't see it, and I think this opens up a can of worms."  JA507.

### 4.    Judgment

At the close of all evidence on the second day of trial, the DEA moved again for judgment under Rule 50(a).  JA519.  Gilmore opposed, arguing that the legitimacy of the DEA's proffered reasons were "issues of fact for the jury," noting

33

that witnesses had testified on either side of those issues and that the paper record supported Gilmore's case.  JA519-520.

The court granted the DEA's motion.  JA523-524.  The court held that no rational juror could conclude that the DEA's two proffered explanations—Gilmore's lack of enforcement experience and the backlog of background checks—were pretextual.  JA521-523.  In the court's view, those proffered reasons "ha[d] very strong support in the record."  JA521.  The court relied in part on the 2005 Career Board meeting as evidence that "on-the-ground law enforcement experience is an important element of career progress in the DEA" and not a post hoc justification.  *Id.*  With respect to the backlog, the court found "no dispute that there was a backlog" and "the simple fact is frequently the person who's in charge of an office when there's a problem, whether it's his fault or not, goes down with the ship."  JA522-523.  Finally, although Tandy had not relied on it, the district court noted that Gilmore, unlike Roach and other applicants, "d[id] not have his supervisor recommending or making any statement in support of the application for the SES position."  JA523.  The court then discharged the jury, telling them that Gilmore "just wasn't fit for [the SES] position" and that the court "d[idn't] see any evidence in this record that his race was a factor."  JA524.

## SUMMARY OF THE ARGUMENT

I.    The district court erred by granting the DEA judgment as a matter of law because there was a legally sufficient evidentiary basis for a reasonable jury to find in Gilmore's favor.  Under the burden-shifting framework applicable to Title VII claims, Gilmore satisfied his initial burden by establishing a prima facie case of racial discrimination:  He was an African-American who was eligible for and applied for the promotion, and the DEA denied him that promotion and awarded it to a white candidate.  When the DEA came forward with purported legitimate reasons for that decision, Gilmore satisfied his burden again by presenting evidence that those justifications were mere pretext.  Administrator Tandy stated that she was deeply concerned about the Office of Security Program's backlog of background checks, but she knew of no facts that would substantiate that concern.  She did not know if Gilmore was responsible for that backlog, if Gilmore had acted to alleviate that backlog, or if that backlog even existed at the time she decided to pass over Gilmore for promotion.

Tandy also stated that Gilmore lacked relevant field experience in enforcement that was necessary for the DCI position.  But field experience was not included among the written qualifications for the SES position.  And despite his supposedly inadequate enforcement experience, Gilmore had already performed at "Outstanding" and "Excellent" levels for two years in the DCI position.  In any

35

event, Gilmore in fact had decades of relevant field experience in life-or-death

enforcement situations, building cases against drug distributors, and working as

part of a team on the ground.

Based on those discredited justifications (and alternative justifications

offered by others), combined with the fact that Tandy chose to promote an

objectively less qualified white candidate, a reasonable juror could have concluded

that Gilmore had been discriminated against on the basis of his race.

II.    The district court also abused its discretion in excluding any evidence

that would have explained the purpose of the Best Qualified and Qualified lists and

contextualized their importance in preventing racial discrimination.  None of the

witnesses were permitted to discuss the *Segar* litigation or explain the origins of

the Stipulated Procedures.  DEA witnesses testified in effect that there was no

substantive difference between the two lists.  The jury was thus deprived of critical

information that would have supported a finding of pretext, namely, that the DEA

had departed from its usual promotion procedures—procedures designed for the

specific purpose of preventing racial discrimination—in selecting Roach instead of

Gilmore.  The excluded evidence was clearly relevant, and any concern of unfair

prejudice or confusion could have been cured with a limiting instruction, as the

court itself recognized.  Furthermore, Gilmore was prejudiced by that exclusion, as

it deprived him of a key fact—departure from normal procedures—that is

classically admissible evidence to support a claim of racial discrimination and pretext. *See Buckley v. Mukasey*, 538 F.3d 306, 319-320 (4th Cir. 2008).

## ARGUMENT

### I.    THE TRIAL RECORD DID NOT PERMIT JUDGMENT AS A MATTER OF LAW

#### A.    Standard Of Review

This Court reviews an order granting judgment as a matter of law de novo, "viewing the evidence in the light most favorable to" the nonmoving party "and drawing all inferences in [the nonmoving party's] favor." *Buckley v. Mukasey*, 538 F.3d 306, 321 (4th Cir. 2008). "[I]f the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and a motion for judgment as a matter of law should be denied." *Fontenot v. Taser Int'l, Inc.*, 736 F.3d 318, 332 (4th Cir. 2013). On appeal, the Court should "not weigh evidence nor judge the credibility of witnesses," but rather must determine whether "there is sufficient evidence for a reasonable jury to have found in" the plaintiff's favor. *First Union Commercial Corp. v. GATX Capital Corp.*, 411 F.3d 551, 556 (4th Cir. 2005). If the district court grants a Rule 50 motion where "reasonable minds could differ," this Court "must reverse." *Buckley*, 538 F.3d at 321.

#### B.    The Title VII Burden-Shifting Framework

To succeed on his Title VII claim that he was denied promotion because of his race, Gilmore first had to establish a prima facie case: that he belonged to a racial minority, that he applied for and was qualified for the vacant SES position,

that he was rejected despite his qualifications, and that the vacancy was filled by an applicant from a non-protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The district court properly found that Gilmore met his burden to prove this prima facie case. JA297. At that point, the burden shifted to the DEA to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the DEA offered a legitimate, nondiscriminatory reason, Gilmore could still prevail by "prov[ing] by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

Although this framework required Gilmore ultimately to persuade the jury that the DEA "intentionally discriminated against" him, Gilmore could meet that burden "by showing that [DEA]'s proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143 (internal quotation marks omitted). Where a factfinder disbelieves a defendant's proffered justification, "it is *permissible* for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* at 147. In particular, "disbelief of the reasons put forward by the defendant … may, together with the elements of the prima facie case, suffice to show intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 511 (1993)).  Accordingly, because a finding of pretext by the jury

would have "*permi[tted]*" a verdict in Gilmore's favor, *Reeves*, 530 U.S. at 147,

judgment as a matter of law was precluded if "reasonable minds could differ" as to

whether DEA's proffered justifications were pretextual, *Buckley*, 538 F.3d at 321.

### C.    Considering The Record As A Whole, Reasonable Minds Could Differ About Whether The DEA's Offered Justifications Were Pretextual

Based on the evidence, the jury could have reasonably concluded that

Administrator Tandy's proffered reasons for not promoting Gilmore were

pretextual and "unworthy of credence." *Reeves*, 530 U.S. at 143.[12]  As an initial

matter, the jury could have questioned Tandy's story from the outset when she

repeatedly insisted that she "did not consider" Gilmore for the SES promotion.

JA443; *see also* JA429, 442.  As noted, *supra* p. 25 & n.8, Leonhart testified that

Tandy did "consider[] Gilmore for all the vacant SES positions."  JA510.  And

Tandy went on to give reasons why she had not promoted Gilmore.  These

inconsistencies suggested that Tandy either truly had not given Gilmore's

---

[12]    If the jury found one of the DEA's reasons to be false, it could have permissibly inferred that DEA's remaining reasons were also pretext.  *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 814 (10th Cir. 2000) (when plaintiff casts "substantial doubt" on many of employer's proffered justifications, jury may "find the employer lacks credibility" and "need not believe the employer's remaining reasons"); *cf. Roebuck v. Drexel Univ.*, 852 F.2d 715, 734 n.32 (3d Cir. 1988) ("[S]uch an inference is not mandated and hence … a verdict in favor of the defendant should not be overturned on these grounds; we hold only that such an inference is *permissible*." (emphasis added)).

application any consideration, and that the factors she cited at trial were post hoc rationalizations, or that Tandy did consider Gilmore and reject him, yet for some reason felt the need to deny it. Leaving that puzzle aside, though, neither of Tandy's two proffered reasons holds up under scrutiny.

## 1. Backlog of background checks

The jury could easily have dismissed Tandy's claim that she based her decision on OSP's background-check backlog. As an initial matter, Tandy's testimony about her call with the Department of Justice did not reconcile with the other evidence. Although Tandy testified that she received a memorable, "embarrassing" call about backlog problems near the end of Gilmore's tenure as DCI (JA434, 445), the evidence contradicted that account. The call actually concerned the EQuip program, not the backlog, and it happened midway through Gilmore's tenure, not near the end. *See* JA190 (Gilmore); JA479-480 (Leonhart); JA730 (contemporaneous email); *see supra* p. 26. A reasonable juror could justifiably discredit Tandy's account when it was inconsistent with other evidence. *See Taylor v. Western & S. Life Ins. Co.*, 966 F.2d 1188, 1197-1198 (7th Cir. 1992) (finder of fact may generally credit one witness over another when their testimony contradicts each other); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 833 (4th Cir. 1994) (judgment as a matter of law is inappropriate when a jury is needed to weigh and resolve conflicting evidence).

In addition, although Tandy asserted that she was deeply concerned about this unprecedented phone call, none of Gilmore's performance reviews or other contemporaneous evidence cited the backlog or the Justice Department inquiry as a mark against his record. Instead, Gilmore's supervisor, Guevara, rated Gilmore's performance as "Outstanding" in 2006—the year of the "extraordinary" phone call (JA434)—and "Excellent" in an interim report the following year, making no mention of any issues with EQuip or the backlog. JA568-619 (performance evaluations). Deputy Administrator Leonhart reviewed and signed each of those evaluations to indicate her concurrence. JA494-496 (Leonhart); JA503-504 (Leonhart). When an employer cites poor performance as a basis for an adverse employment action, but no contemporaneous documentation of the issue appears in evaluations or other records, the jury may infer that the "asserted justification of 'poor performance' was not only a post hoc rationalization but … was also calculated to conceal" discrimination. *Benjamin v. United Merchs. & Mfrs., Inc.*, 873 F.2d 41, 44 (2d Cir. 1989). That is especially so here, where Gilmore's superiors understood that Gilmore had inherited the backlog problem and took effective measures in response. *See* JA191-193 (Gilmore describing frequent meetings with Leonhart and Guevara to address backlog, responses, and significant reduction); JA386-388 (Kasson acknowledging that Gilmore "did not create the backlog" and took measures to address it).

41

Finally, Tandy simply had no basis to conclude that Gilmore was responsible for any "embarrassment" related to the backlog. JA434. Tandy admitted that she did not know even the basic facts about the backlog—when did it start, how big was it, did Gilmore cause it, did Gilmore contribute to it, did Gilmore take any action to reduce it. JA444-445. Tandy said she "wasn't performing that review" and did not endeavor to learn anything more about the issue—a curious omission in light of her alleged concern that the issue could potentially "determine what funds DEA is going to have or not have in its annual budget." JA434, JA445. The jury could "easily find it implausible" that Tandy would reject Gilmore for an SES position "without first substantiating" her concerns and could doubt the genuineness of those concerns in light of her failure to investigate. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001).

When Gilmore's counsel confronted Tandy with these gaps and inconsistencies, she shifted away from the backlog explanation:

> Q:    But you nevertheless say that you based a promotion decision on this issue of the backlog?
>
> A:    It was twofold, as I said. … I would not have selected Mr. Gilmore for the position because of his lack of enforcement operations experience.

JA445.

In granting the DEA's Rule 50 motion, the district court supplied its own theory about the significance of the backlog: "[T]he simple fact is frequently the

42

person who's in charge of an office when there's a problem, whether it's his fault or not, goes down with the ship." JA523. But no DEA witness gave this as a reason not to promote Gilmore. *See Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007) ("[C]ourt must focus on the motivations and perceptions of the actual decisionmaker"). And even if this were a plausible interpretation of events, the district court's conclusion was certainly neither compelled by the evidence nor the sole reasonable inference. *See Buckley*, 538 F.3d at 321 (court must draw all inferences in favor of the nonmoving party).

### 2. Lack of field experience

Tandy's assertion that Gilmore lacked necessary enforcement experience was similarly pretextual. JA445-446. First, Tandy's requirement that applicants for any SES position must have some unspecified amount and type of enforcement experience—even for a DCI position that does not engage in field enforcement (JA245)—is not written anywhere as a requirement for the SES generally or the DCI position in particular. JA650-660 (Tandy memo describing DCI role and qualifications); JA621-642 (SES application handbook); JA320 (Horvath). Moreover, Tandy's approach was entirely arbitrary; enforcement experience gained as a police officer, a DEA special agent, a special agent pilot, or an ASAC in certain DEA divisions apparently did not count. That kind of reliance on "unwritten subjective criteria for making promotion decisions" can be considered

43

evidence of discrimination. *Holsey v. Armour & Co.*, 743 F.2d 199, 214 (4th Cir. 1984); *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) ("[C]ourts view with skepticism subjective evaluation methods" (citing cases)). That is particularly so here, where Tandy adopted this manipulable criterion in a departure from established, objective Stipulated Procedures that were specifically designed to prevent racial discrimination. *Supra* pp. 6-7.

*Second*, Tandy's assessment of Gilmore's enforcement experience was demonstrably wrong. Tandy testified that Gilmore "had never even been close to performing those kinds of duties and mission critical functions and life-threatening experiences." JA446. When pressed on what she knew about Gilmore's enforcement experience, Tandy stated she was "aware that he was a police officer in … his prior life" and that he "provided support" in the Aviation Division. JA446-447. That characterization badly understated Gilmore's decades of experience building cases and conducting enforcement actions on the ground as a police officer and a DEA special agent, often in dangerous undercover work and life-threatening situations. *Supra* pp. 8-10.

Tandy's assertion was also belied by numerous evaluations praising Gilmore's "clear understanding of DEA enforcement policies and procedures" and "strong sense of law enforcement." JA539 (supervisor comments on SES application); *see also id.* (Gilmore "knows what it takes to be a law enforcement

officer");  JA644 ("excellent experienced agent"); JA530 (highest rating on GS-15

assessment test for "ability to plan and coordinate enforcement operations");

JA246-247 (Guevara:  Gilmore's "significant enforcement experience" would

enable him to perform well as DCI).  The fact that Tandy "misjudged" Gilmore's

qualifications is "probative of whether [her] reasons are pretexts for

discrimination."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 259

(1981); *see also Byrnie v. Town of Cromwell*, 243 F.3d 93, 105 (2d Cir. 2001)

(factfinder could conclude that school's proffered justification that teacher lacked

teaching competencies was pretextual where teacher had decades of experience and

worked at the school for five years); *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d

1180, 1183 (D.C. Cir. 1996) ("Evidence indicating that an employer misjudged an

employee's performance or qualifications is … relevant to the question whether its

stated reason is a pretext masking prohibited discrimination; if the employer made

an error too obvious to be unintentional, perhaps it had an unlawful motive for

doing so." (citation omitted)).

     The district court addressed none of this evidence in granting the DEA's

Rule 50 motion.  The court relied on only two points in concluding that no

reasonable juror could find Tandy's emphasis on enforcement experience to be

pretextual.  First, the court cited the audio recording of the 2005 Career Board

meeting, which showed that, in 2005, Leonhart and others considered field

experience to be relevant to elevation to the SES. JA521; *supra* p. 30. The court stated that this evidence showed that the importance of field experience "wasn't just made up at the last minute in a defense to this lawsuit." JA521. But that observation did not address the subjectivity of Tandy's unwritten enforcement-experience requirement or Tandy's misjudging of Gilmore's record. Moreover, as the audio recording showed, some Career Board members thought Gilmore did have adequate experience. JA721.[13]

The district court also noted the "simple fact" that "there is a difference" between Gilmore's experience and "what he would be doing were he an ASAC in a field office." JA521-522. But this reasoning replicates all the same problems of subjectivity as Tandy's testimony and ignores the fact that nothing in any DEA handbook or policy makes service as an ASAC in a field office a requirement for the SES.

Gilmore thus introduced ample evidence that Tandy's two asserted justifications were pretextual. And Gilmore was objectively better qualified than Barbara Roach, according to DEA's objective assessment procedures. Both Gilmore and Roach were evaluated by an impartial panel that ranked Gilmore on

---

[13]    The Career Board recording was already in evidence when the district court denied DEA's initial Rule 50 motion, finding that Gilmore had "already put forward pretext" and "the law enforcement experience issue is wide open." JA298; *see also* JA267, 271.

the Best Qualified list and ranked Roach only on the Qualified list. JA283-284.

"Because a jury could reasonably conclude that [Gilmore] was objectively better qualified for the position" than Roach, it was also permitted to conclude that any justification for not promoting Gilmore was unacceptable pretext. *Ham v. Washington Suburban Sanitary Comm'n*, 158 F. App'x 457, 469 (4th Cir. 2005); *see also McCullough v. Real Foods, Inc.*, 140 F.3d 1123, 1129 (8th Cir. 1998) (failure to promote objectively better qualified candidate in protected class raises inference that the decision was based on an impermissible consideration).[14]

Gilmore's evidence that DEA's proffered reasons were "unworthy of credence," along with this essential component of the prima facie case, sufficed to permit a reasonable jury to infer the ultimate fact of intentional discrimination. *Reeves*, 530 U.S. at 143, 147. Indeed, the district court recognized the strength of Gilmore's case repeatedly, denying a motion to dismiss, a motion for summary judgment, and DEA's first motion for judgment as a matter of law on the ground that Gilmore had shown a prima facie case, "put forward pretext," and introduced "more than enough evidence … for the case to go forward." JA297-298; *see also*

---

[14] The district court also noted that Gilmore did not have a supervisor's recommendation for the SES promotion, but Roach did. JA523. Administrator Tandy did not rely on this in deciding not to promote Gilmore, and the district court therefore should not have considered it. *Bennett*, 507 F.3d at 31. Moreover, the court ignored the testimony of Gilmore's supervisor, Guevara, who stated that no one asked him whether he recommended Gilmore, but that if anyone had asked, he would have recommended him. JA261-262.

JA77-79; DE 35 at 1.  The only thing that appears to have changed between those rulings and the entry of judgment as a matter of law is that the district court had an opportunity to "see[] the witnesses testify" (JA78),  and see whether those witnesses betrayed any "evidence of racial animus" (JA523).  But it was the jury's prerogative to evaluate the credibility of Administrator Tandy and the other DEA witnesses, to resolve conflicting evidence, and to determine whether the evidence of pretext amounted to "evidence of racial animus."  The district court erred in entering judgment as a matter of law, and the case should be remanded for a new trial.

## II.   THE DISTRICT COURT ABUSED ITS DISCRETION BY EXCLUDING TESTIMONY REGARDING THE ORIGIN AND PURPOSES OF DEA'S STIPULATED PROCEDURES

### A.   Standard Of Review

This Court reviews a trial court's decision to exclude evidence for abuse of discretion and should reverse where an evidentiary error "affects … substantial rights."  *Buckley*, 538 F.3d at 317 (internal quotation marks omitted).  Evidence excluded under Federal Rule of Evidence 403 must be reviewed "in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect."  *United States v. Russell*, 971 F.2d 1098, 1106 (4th Cir. 1992).

**B.    Evidence About The Stipulated Procedures Was Relevant To Understanding The Irregularity Of Roach's Promotion From The "Qualified" List And To Evaluating Pretext**

The district court abused its discretion in preventing Gilmore from eliciting testimony about the *Segar* litigation, the purposes of the Stipulated Procedures that arose out of that litigation, and the circumstances leading to the temporary suspension of those Procedures.  Although the district court recognized the relevance of that evidence as "background information" (JA88-89), the court excluded the evidence based on its determination that admitting a short explanation of the purpose behind the Stipulated Procedures would "open[] up a can of worms" and potentially confuse the jury since the Procedures were suspended at the time Tandy decided to promote Roach instead of Gilmore (JA507).

The court erred in conflating what the Stipulated Procedures legally required with how the DEA regularly proceeded in promoting agents to SES positions. Although the D.C. District Court's 2006 order briefly suspended the legal requirement that the DEA Administrator could fill SES positions only from the Best Qualified list (or existing SES-level employees), promoting from the Best Qualified list had been the DEA's regular procedure for the previous four years and resumed being its regular procedure once the order was vacated.  *Segar v. Mukasey*, 508 F.3d at 21.  Evidence of an unexpected deviation from regular procedure would have been directly relevant to Gilmore's Title VII claim as

49

evidence of pretext.  *Vaughan v. MetraHealth Cos.*, 145 F.3d 197 (4th Cir. 1998)

(deviation from downsizing manual is evidence of pretext), *abrogated on other*

*grounds*, *Reeves*, 530 U.S. 133; *see also Blow v. City of San Antonio*, 236 F.3d

293, 297 (5th Cir. 2001) (failure to publicize available jobs as required is evidence

of pretext).  A reasonable juror "could conclude that this irregularity" in the normal

process for SES promotions "undermine[d] the credibility of the proffered

explanations" for passing over Gilmore.  *Diaz v. Eagle Produce Ltd.*, 521 F.3d

1201, 1214 (9th Cir. 2008).

       In addition to signaling a deviation from normal practice, evidence about the

*Segar* litigation and Stipulated Procedures would also have provided the proper

context to the jury's evaluation of whether the DEA's proffered justifications were

in fact pretext, particularly Tandy's unwritten, subjective requirement that

applicants have some unspecified field experience.  The *Segar* court found that

racial discrimination went unchecked at DEA because of its "subjective" standards

for promotion.  *Segar v. Civiletti*, 508 F. Supp. at 697.  The court directed that

those standards be counteracted through the "implementation of a non-

discriminatory selection process" designed to identify on the basis of transparent,

objective criteria "the highest quality candidates from which to choose" for SES

service.  *Segar v. Mukasey*, 508 F.3d at 19.  Evidence that DEA ignored its

"reasonably objective standards and procedures for evaluating the applicant" in

50

favor of a subjective and opaque standard that operated more like the standards rejected in *Segar* would thus have been highly relevant to the jury's evaluation of Tandy's enforcement experience requirement. *Warren v. Halstead Indus. Inc.*, 802 F.2d 746, 753 (4th Cir. 1986).

In particular, with a clear understanding of the Best Qualified and Qualified lists, a juror likely would have been more skeptical of Administrator Tandy's reliance on her own subjective, unwritten, and unannounced requirement that SES applicants must have a particular type of field experience, even for an administrative position like the DCI of OSP. Such subjective evaluations leave a great deal of room for discrimination or, as relevant here, room for a jury to infer discrimination if they find the decisionmaker's subjective justifications to lack credibility.

A juror with sufficient knowledge of the context of the Stipulated Procedures would thus have been able to understand that (1) the Best Qualified list was specifically designed to identify the objectively best candidates and to guard against subjective considerations, (2) the Best Qualified list was specifically designed to address racial discrimination at the DEA, and (3) Tandy's selection of a candidate from the Qualified list instead of the Best Qualified list was an aberration from standard DEA hiring practices that might require a more credible justification than would otherwise be necessary. *See Young v. Warner-Jenkinson*

*Co.*, 152 F.3d 1018, 1024 (8th Cir. 1998) ("[T]he fact that Warner-Jenkinson may have deviated from its policies, when coupled with the fact that the company mischaracterized [plaintiff's work] "absence in a manner giving rise to negative connotations, lends support to an inference of improper motive.").

Viewed in the light most favorable to Gilmore, the probative effect of the *Segar* evidence would not have been substantially outweighed by confusion of the issues or undue prejudice. As it previously recognized (JA88-89), the court could have prevented the jury from drawing any inappropriate or prejudicial inferences by issuing an instruction telling the jury how to consider the information—*i.e.*, as contextual evidence, not evidence of other bad acts or predisposition to discriminate. *See United States v. Cabrera-Beltran*, 660 F.3d 742, 756 (4th Cir. 2011) ("[A]ny remaining danger of unfair prejudice was alleviated by the cautionary jury instruction given by the district court."); *see also* DE 160 at 3-4, 6-7 (proposing limited use of evidence to explain purpose and significance of Stipulated Procedures and Best Qualified list and reasons for temporary suspension; proposing use of limiting instruction to prevent prejudice).

### C. Evidence Placing The Stipulated Procedures In Their Appropriate Context Is Admissible Under This Court's Precedent

Permitting Gilmore to elicit testimony about the origins and purposes of the Stipulated Procedures in the circumscribed manner Gilmore proposed would have been consistent with this Court's precedent, under which it is appropriate to admit

evidence of related litigation and court orders when doing so will provide the jury

with evidence crucial to their understanding of the alleged discriminatory act. *See*

*Buckley*, 538 F.3d at 320; *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1413 (4th

Cir. 1992) (en banc).

In *Buckley*, this Court directly addressed the propriety of introducing

evidence about the *Segar* litigation to inform and educate the jury on an issue of

"critical importance." *Buckley*, 538 F.3d at 320.  DEA Agent Mary Buckley sued

the DEA for failure to promote, geographic reassignment, and negative reviews.

*Id.* at 313-314.  Buckley claimed in part that DEA took these actions against her in

retaliation for her participation in the *Segar* litigation.  *Id.* at 314-315.  The district

court precluded Buckley from introducing evidence about the litigation except to

inform the jury that she was involved in some litigation against the DEA for race

discrimination.  *Id.* at 315.  When Buckley appealed the jury's verdict against her,

this Court reversed, holding that the district court had abused its discretion in

excluding evidence about the *Segar* litigation.  *Id.* at 320-321.  The Court

explained that:

> [a]lthough Buckley was permitted to introduce evidence on the
> requirements of the DEA's promotion system and its purpose of
> ensuring equal opportunity, she was prohibited from mentioning to the
> jury that the promotion system was governed by the *Segar* 2000
> Interim Order or in any way connected to the nebulous "ongoing
> litigation" against the DEA in which she was involved. *These
> restrictions on the* Segar *litigation evidence foreclosed a coherent and*

53

> *compelling evidentiary account of the government's alleged*
> *retaliation.*

*Buckley*, 538 F.3d at 319 (emphasis added).

Similarly, in *Johnson v. Hugo's Skateway*, the plaintiff, an African-American, sued the white owner of a roller skating rink, alleging racially motivated harassment and intimidation. 974 F.2d at 1410. This Court found no abuse of discretion when the district court admitted evidence that the defendant was subject to a consent agreement requiring it to (1) post signs that patrons would be treated equally "without regard to race or color" and (2) instruct employees to treat all people equally. *Id.* at 1413.

Sitting en banc, this Court explained that evidence about the consent agreement was not being offered to show that the defendants had discriminated in the past, but only to consider "whether [the skating rink] had posted the signs or instructed their employees as required by the agreement, which bore directly on the rink owners' racial animus" on the date of the altercation. *Johnson*, 974 F.2d at 1413.

Here, as in *Buckley* and *Johnson*, evidence about the *Segar* litigation and the Stipulated Procedures was necessary to give the jury a complete and coherent understanding of Gilmore's claim. In particular, contextual information about the purpose, origin, and application of the Stipulated Procedures and the Best Qualified and Qualified lists related directly to whether the DEA departed from

54

standard procedures—procedures designed specifically to prevent racial discrimination and ensure the promotion of objectively better qualified candidates—and, if so, what significance such a departure would have.

By excluding any discussion of the purposes of the Stipulated Procedures and their origins in the *Segar* litigation, the district court precluded Gilmore from giving the jury a coherent and complete understanding of the Best Qualified lists and from "cogently demonstrat[ing]" his superior qualifications and the pretext inherent in the DEA's justifications. *Buckley*, 538 F.3d at 320. Instead, the jury heard only truncated and conflicting views about the significance and purpose of the lists. *See* JA211 (Gilmore explaining he thought SES positions were supposed to be filled from the Best Qualified list); JA326 (Horvath: "They are just lists"); JA441 (Tandy explaining that Best Qualified was a "sterile, artificial designation" that did not "really mean[]" a person is best qualified). Excluding the evidence was not necessary to mitigate confusion or prejudice, as the appropriate cure would have been a limiting instruction. *Buckley*, 538 F.3d at 320 ("To the extent there is any danger of confusion of the issues, a limiting instruction could be utilized to caution the jury that the *Segar* litigation evidence is to be considered only as evidence of" proper procedures to combat racial discrimination).

### D.     Exclusion Constituted Reversible Error

Where the exclusion of evidence "prevent[s] the jury from gaining a full understanding of the nature" of the dispute, it affects the substantial rights of the party prejudiced by the exclusion and requires a new trial. *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 834 (4th Cir. 1999). Thus, in *Buckley*, this Court held that Buckley was entitled to a new trial because "[r]estricting the *Segar* litigation evidence affected Buckley's substantial rights by rendering her unable to cogently demonstrate" an element of her case. *Buckley*, 538 F.3d at 320.

In this case, Gilmore sought to demonstrate that DEA had adopted a policy of "selecting among those candidates who are judged to be the best qualified for the job" and that it consciously departed from that policy when it promoted Roach from the Qualified list over any Best Qualified candidate, including Gilmore. *See Segar v. Mukasey*, 508 F.3d at 23. Without the necessary background information about the Stipulated Procedures and the Best Qualified list that was used to prevent racial discrimination and identify the objectively best-qualified candidates, the jury was left with a distorted understanding of the lists that the DEA was free to capitalize upon by denying that there was any qualitative difference between the lists. *See Jimenez v. DaimlerChrysler Corp.*, 269 F.3d 439, 459 (4th Cir. 2001) (excluding evidence that plaintiff was not wearing a seatbelt was error and

prejudicial to defendant car manufacturer; jury was "left to infer" about proximate cause and plaintiff's counsel's "mistaken" representations).

The district court's error thus affected Gilmore's substantial rights, and the Court should hold that Gilmore is entitled to a new trial in which he may elicit information about the purpose, origin, and application of the Stipulated Procedures.

## CONCLUSION

The Court should reverse the judgment of the district court and remand the case for a new trial.

Respectfully submitted.

/s/ Catherine M.A. Carroll
CATHERINE M.A. CARROLL
ERIC MAHR
AMANDA L. MAJOR
DANIEL AGUILAR
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 663-6000

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the

undersigned hereby certifies that this brief complies with the type-volume

limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.     Exclusive of the exempted portions of the brief, as provided in Federal

Rule of Appellate Procedure 32(a)(7)(B), the brief contains 13,030 words.

2.     The brief has been prepared in proportionally spaced typeface using

Microsoft Word 2000 in 14 point Times New Roman font.  As permitted by

Federal Rule of Appellate Procedure 32(a)(7)(B), the undersigned has relied upon

the word count feature of this word processing system in preparing this certificate.

/s/ Catherine M.A. Carroll
CATHERINE M.A. CARROLL

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2014, the foregoing Brief was filed electronically with the Clerk of the Court and served on all parties of record through the CM/ECF system.

/s/ Catherine M.A. Carroll
CATHERINE M.A. CARROLL